# In the United States Court of Federal Claims

No. 14-80C
(Originally Filed: March 20, 2014)[1]
(Reissued: March 27, 2014)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

DM PETROLEUM OPERATIONS
COMPANY,

        *Plaintiff*,

v.

THE UNITED STATES,

        *Defendant*,

and

FLUOR FEDERAL PETROLEUM
OPERATIONS, LLC,

        *Intervenor*.

Bid Protest; Best Value
Tradeoff; Strategic
Petroleum Reserve;
Agency Discretion;
Reasonableness.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

    *Robert J. Symon*, Washington, D.C., and *Daniel P. Golden* and *Aron C. Beezley*, Washington, D.C., of counsel, for plaintiff.

    *William P. Rayel*, Civil Division, Department of Justice, Washington, D.C., with whom were *Stuart F. Delery*, Assistant Attorney General, *Bryant G. Snee*, Acting Director, and *Deborah A. Bynum*, Assistant Director, for defendant.

    *Thomas L. McGovern III*, Washington, D.C., and *Michael D. McGill* and *C. Peter Dungan*, Washington, D.C., of counsel, for intervenor.

---

[1] This opinion was originally issued under seal, and publication was deferred pending the parties' review for redaction of protected materials. The parties agreed that no redactions were required.

OPINION

This is a post-award bid protest of the Department of Energy's selection of Fluor Federal Petroleum Operations, LLC ("Fluor") as the management and operating contractor for the Strategic Petroleum Reserve. The parties briefed the case on cross-motions for judgment on the administrative record, and oral argument was held on March 7, 2014. Because the agency's decision was not arbitrary or capricious, we deny plaintiff's motion for judgment on the administrative record and grant defendant's and intervenor's cross-motions for judgment.

BACKGROUND

The Department of Energy ("DOE") maintains the nation's Strategic Petroleum Reserve ("SPR"). Plaintiff, DM Petroleum Management Operations Company ("DM") has been the primary management and operations ("M&O") contractor for the SPR since 1993, having successfully completed two back-to-back 10 year contracts with DOE. In February 2012, contemplating the end of the current SPR M&O contract, DOE issued solicitation No. DE-SOL-0003490, which invited proposals for a five year contract with a DOE option for five additional years. The solicitation announced a cost-plus award fee performance-based contract to be awarded to the proposal evaluated to be "the best value and most advantageous to the Government." Administrative Record ("AR") 686, 911. The contract was competed as a negotiated procurement pursuant to Federal Acquisition Regulation part 15. The solicitation informed offerors that discussions would likely not be held.

Proposals were first evaluated by the Source Evaluation Board ("SEB") and then a final offeror selected by the Source Selection Official ("SSO") using the best value analysis described in the solicitation. In doing so, the SSO was to consider "the Technical Evaluation Criteria . . . significantly more important than evaluated price." AR 912. Offerors were informed, however, that the more similarly they were evaluated for technical merit, "the more likely the evaluated price may be the determining factor in selection for award." *Id.*

The solicitation listed six technical factors to be adjectivally rated by the SEB: (1) Management Approach, (2) Key Personnel, (3) Organizational Structure, (4) Past Performance, (5) Relevant Experience, and (6) Transition Approach. Management Approach was the most important factor and second

was Key Personnel.  Organizational Structure and Past Performance were of "equal importance and when combined [were] equal in importance to Management Approach."  *Id.*  Relevant Experience and Transitional Approach were equally important and least among all of the factors but were combined to be equal to Key Personnel.  The technical evaluation was "significantly more important than the cost evaluation criteria."  AR 911.

With respect to the most important technical factor, Management Approach, the agency informed offerors that DOE would evaluate their "approach to managing and operating activities at the [SPR]."  AR 913.  It went on to notify bidders that,

> DOE will evaluate the depth, quality, effectiveness, and completeness of the Offeror's proposed approach to performing the work described in the PWS [Performance Work Statement], including implementing a contractor assurance system that identifies and corrects deficiencies; developing budgets and establishing cost controls; achieving safe and environmentally responsible performance of work; assuring the operational readiness of the storage sites/facilities; managing a large workforce; ensuring the integrity, including optimal storage capacity, of the crude oil storage caverns; and identifying specific actions to reduce contract costs.

*Id.*   The "commitment and availability of corporate resources to support efficient and effective contract performance" was also considered.  *Id.*

For the Organizational Structure factor, DOE was concerned with offerors' "rationale for the proposed organizational structure for its providing an effective and efficient structure for the successful accomplishment of the work to be performed . . . ."  AR 914.  For Past Performance, the solicitation indicated that the agency would evaluate the offeror, "its teaming partners, as well as major subcontractors' past performance . . . on the basis of information furnished by the references identified in Section L and any other available sources."  *Id.*  The solicitation further provided that, for major subcontractors, DOE "will evaluate . . . past performance commensurate with the portion of the work being performed under the solicitation/PWS."  *Id.*  Offerors or their subcontractors without relevant past performance history were to be rated as neutral.

The Source Selection Plan listed five possible adjectival ratings for the

3

technical factors: Outstanding, Good, Satisfactory, Marginal, and Unsatisfactory.  Relevant to this case are the definitions of the top three ratings.

> **Outstanding**: The proposal demonstrates a very high probability of successful contract performance.  In general, the response would be described as excellent or superior.
>
> The proposal also demonstrates a comprehensive understanding of the contract requirements; and a highly effective approach to perform the work that will likely exceed the contract requirements.  Such a response may be evidenced by a proposal that exhibits several significant strengths; several or many strengths; few, if any, weaknesses, no significant weaknesses; and no deficiencies.
>
> **Good**: The proposal demonstrates a high probability of successful contract performance.  In general, the response would be described as conscientious, competent, and complete.
>
> The proposal also demonstrates a proficient understanding of the contract requirements, and an effective approach to perform the work that may exceed the contract requirements.
>
> Such a response may be evidenced by a proposal that exhibits few, if any, significant strengths; many strengths, few weaknesses; few, if any, significant weaknesses; and no deficiencies.
>
> **Satisfactory**: The proposal demonstrates a moderate probability of successful contract performance.  In general, the response would be described as suitable or sufficient.
>
> The proposal also demonstrates an adequate understanding of the contract requirements, and an acceptable approach to perform the work that will achieve the contract requirements.
>
> Such a response may be evidenced by a proposal that exhibits few, if any, significant strengths; several strengths; several or many weaknesses; offsetting strengths and weaknesses; few, if any, significant weaknesses; and no deficiencies.

AR 958-59.

Five offerors submitted proposals and were evaluated by DOE. The SEB members produced individual ratings for each offeror and then met and agreed upon a consensus rating for each offeror in March 2013. Only the offers of DM and Fluor are relevant to this protest. Their ratings were as follows:

| Factor | DM | Flour |
| --- | --- | --- |
| Management Approach | Satisfactory | Good |
| Key Personnel | Outstanding | Outstanding |
| Organizational Structure | Good | Good |
| Past Performance | Good | Good |
| Relevant Experience | Outstanding | Good |
| Transition Approach | Outstanding | Satisfactory |
| Evaluated Price | $95,660,755 | $98,056,245 |

AR 5489 (technical), 5503 (price).[2]  The SSO reviewed the SEB's consensus report, found it to be "rigorous, thorough, and consistent with the evaluation criteria stated in the solicitation."  AR 5742 (Source Selection Decision). After reviewing the SEB report and the proposals, the SSO selected Fluor for contract award based mainly upon Fluor's advantage in the Management Approach factor. *See* AR 5774-77.

Because DM's proposal was evaluated to cost less than Fluor's, the SSO conducted a best value trade off between the two proposals. Although DM's price was approximately $2.5 million lower and DM was superior in the two lowest importance factors, Relevant Experience and Transition Approach, the SSO believed that Fluor's advantage in the Management Approach factor

---

[2] The evaluated price was calculated as the "most probable cost for proposed key personnel and transition activities plus the proposed total available award fee for the base and option periods."  AR 911.

justified paying the "slight evaluated price premium," which he found to be "not disproportionate to the benefits associated with Fluor's evaluated superiority." AR 774. His analysis centered on three areas of Fluor's proposal that he found to present advantages in the area of Management Approach.

The first was Fluor's "One/Fluor/One SPR – One Team/One Mission/One Vision" concept that permeates its proposal. This was described as the integration of "the Fluor SPR contract with the entire Fluor corporate structure to ensure that the SPR will benefit from the Fluor collective experience." *Id.* The SSO believed this would make available to the SPR the best practices and effective management tools gleaned from Fluor's experience as a whole. The SSO found that this approach "presents a significant strength to [Fluor's] management approach because of its focus on operational readiness and the safe, efficient, and effective performance of the PWS elements." *Id.*

The second discriminator cited by the SSO was Fluor's emphasis on planning, not just for the short-term, but also for the mid and long-term operation of the SPR. The SSO cited Fluor's planning approach several times throughout his best value analysis. "Fluor has proposed a comprehensive and effective planning process that features plans for 1-year, 5-year, and 20-year planning horizons." AR 5775. He found that this would "not only enhance on-going performance of the PWS, but will ensure a strategic approach to planning and budget formation." *Id.* In contrast, the SSO believed DM's proposal, although strong in its approach to "proven systems, policies, and procedures currently in use under the SPR M&O contract," to be unclear on "on the longer term advantages being offered by its approach." *Id.* The SSO found "a lack of detail . . . as to what exactly the M&O contract will do, when and how it will be done, expected outcomes, and practical issues or problems to overcome." *Id.*

Closely related to its comprehensive planning approach, the SSO specifically cited Fluor's plan to address the long-term issue of cavern integrity at the SPR as the third reason that Fluor offered a better value to the agency. As the SSO stated in his Source Selection Decision, Fluor proposed to establish a "Subsurface Advisory Group consisting of geotechnical and petroleum engineering experts with Gulf Coast experience that will analyze existing SPR cavern and salt dome conditions and propose solutions to issues and concerns." *Id.* In concert with establishing a Subsurface Advisory Group, Fluor proposed creating a forum with neighboring salt cavern owners, which,

in the SSO's view, would enable "the SPR to take better advantage of and use lessons learned to enhance the effectiveness and efficiency of cavern operations." *Id.*

The advantages offered by Fluor were summed up by the SSO in this way:

> The specific advantages of Fluor's management approach proposal that makes it superior to that of DM's and worth the slight price differential of $2,398,490 are that the planning process and its recognition of and proposed approaches to how to address the future issues of the [SPR]. The [SPR] is a national asset and the strategic path forward is important to the Government. The [SPR] is currently configured to meet vulnerabilities that the United States faced in the 1970's and 1980's. It is critical that the M&O Contractor have a sound planning process for the near term, mid-term and long term strategic process. Fluor as reflected in its first strength has a comprehensive and effective planning process for 1 year, 5-year, 10-year, and 20-year planning horizons. Its approach addresses planning for the near term, mid-term, and 20-year planning horizons. Its approach . . . recognizes the importance of integrating near term detailed plans with longer term program considerations.

AR 5776. The SSO further cited Fluor's proposed Subsurface Advisory Group and owners forum to be examples of this planning approach.

The SSO awarded the contract to Fluor and notified DM of the award on September 18, 2013. The agency briefed DM as requested on September 27, 2013. DM filed a protest at the Government Accountability Office ("GAO") on September 30, 2013. At GAO, DM primarily challenged the evaluation of its and Fluor's proposals as unreasonable and not in accordance with the solicitation. DM filed a supplemental protest on November 8, 2013, alleging disparate treatment. GAO denied those protests on January 15, 2014.[3] AR 1870-82 (GAO decision).

---

[3] GAO also denied the protest of a second disappointed bidder on January 24, 2014. *See Gulf Coast Petroleum Reserve Operations, LLC*, B-409004.2, *et al.*, 2014 CPD ¶ 41, 2014 WL 355993 (Comp. Gen. Jan. 24, 2014).

Plaintiff filed suit here on January 28, 2014. A temporary restraining order and preliminary injunction were deemed unnecessary pursuant to the agreement of the parties. Plaintiff asks the court to declare DOE's evaluation and award to be improper and to enjoin the award to Fluor. The thrust of DM's argument is that DOE's evaluation of both its and Fluor's proposals was unreasonable and contrary to the stated criteria in the solicitation. DM alleges that each of the items cited by the SSO as making Fluor's proposal superior was either unreasonable or not unique to Fluor. DM also argues that it was deserving of a higher rating for the Management Approach and Organizational Structure factors. DM also attacks as unreasonable the evaluation of one of Fluor's subcontractors in the Past Performance factor. We reject each of these challenges.

## DISCUSSION

We have jurisdiction over an action by an "interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1) (2012). There is no question that DM is an "interested party" because it was an "actual . . . bidder[] or offeror[] whose direct economic interest would be affected by the award of the contract." *Am. Fed'n of Gov't Emps. v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001).

We review agency action in the bid protest context under the deferential standards of administrative review borrowed from the Administrative Procedures Act. *See* 28 U.S.C. § 1491(b)(4). DOE's actions can only be enjoined if we find them to have been "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A) (2012). In the course of our review, we must not substitute our judgment for that of the agency's. *See Redland Genstar, Inc. v. United States*, 39 Fed. Cl. 231 (1997). All that is required of an agency is that it has a reasonable basis for its decision. *See Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989).

Plaintiff's briefing presents a number of critiques of DOE's selection of Fluor. While we are sympathetic with DM's consternation at not being selected after many years of apparently successful performance of the incumbent contract, all of the challenges, including the ones we select for treatment below, can be characterized merely as calling into question the

agency's legitimate exercise of its own judgment. As is frequently the case in close calls in procurement selections, the fact that the court, or even a different group of agency selection authorities, may have come to another conclusion, is irrelevant.

Plaintiff chose to narrow oral argument to a few of its more pressing issues. Accordingly, we will follow plaintiff's order of presentation there, which focused on the evaluation of the Management Approach, Organizational Structure, and Past Performance factors.

I. Management Approach

Plaintiff argues that the three items from Fluor's proposal under the Management Approach factor that the SSO used to discriminate between DM's and Fluor's proposal were not sufficiently distinct or were not deserving of the praise given them by the agency. DM also argues that, based on the definition of a the adjectival ratings in the solicitation, it should have received a "good" rather than a "satisfactory" for its Management Approach factor. If Fluor's proposal was not as strong under this factor or DM's should have been rated stronger, then perhaps DOE's best value decision would be arbitrary given DM's other advantages on the lower-weighted technical factors and its slight price advantage. Defendant's and intervenor's response to these arguments is that plaintiff is in essence disagreeing with the agency's ratings without identifing any action of the agency that is arbitrary, capricious, or in violation of law or regulation. We agree. None of the challenges which follow demonstrate a violation of law or any irrationality.

A. Fluor's One Fluor/ One SPR Approach

DOE found Fluor's One Fluor/ One SPR concept to be a significant strength under the Management Approach factor. It also cited this concept as one of the reasons that Fluor's proposal represented the best value to the government. Plaintiff finds fault in this analysis because, in its view, the One Fluor/ One SPR concept "offered nothing unique" and "merely complied with the requirements of the Solicitation." P.'s Memo in Supp. of Mot. for J. on AR 14. Plaintiff points out the solicitation's requirement that "[t]he work performed by the offeror shall be conducted by a legal entity separate from its parent organization(s) that will be totally responsible for all contract activities." AR 859. Plaintiff believes Fluor's One Fluor/ One SRP to be nothing more than a slick repackaging of this basic contract requirement.

Plaintiff also criticizes the SSO's praise for the One Fluor/ One SPR concept under the Management Approach factor because plaintiff believes that feature of Fluor's proposal was not properly considered under that factor. Plaintiff directs our attention to the stated focus of the Management Approach factor: "the Offeror's proposed approach to performing work described in the PWS." AR 913. Plaintiff argues that the One Fluor/ One SPR concept is not aimed at the specifics of the M&O contract work but instead is best addressed to the Organizational Structure factor, which was concerned with "effective and efficient structure for the successful accomplishment of the work to be performed under the contract." AR 914. Fluor received credit for the One Fluor/ One SPR concept in the agency's consideration of both the Management Approach and Organizational Structure factors. Citing *GlassLock, Inc.*, B-299931, *et al.*, 2007 CPD ¶ 216, 2007 SL 4200104 (Comp. Gen. Oct. 10, 2007), plaintiff argues that such "double counting" by the agency is prohibited.

We observe initially that plaintiff is wrong in suggesting that DOE could not consider the One Fluor/ One SPR concept under two different technical factors. *See Office Depot, Inc. v. United States*, 95 Fed. Cl. 517, 533 n.18 (2010). Agencies are well within their discretion to consider relevant information under more than one evaluation factor. DOE found that the One Fluor/ One SPR concept was the "foundation for [Fluor's] management approach." AR 5532. This concept, in essence, runs throughout Fluor's proposal. Specific to the Management Approach factor, DOE found that Fluor's approach would enable Fluor to employ best practices and efficiencies in the management of the SPR that it had possessed through its broader corporate structure. *See id.* The SSO specifically found that this demonstrated a focus on "operational readiness and the safe, effective, and efficient performance of the PWS elements." *Id.* Those considerations are specifically related to the work to be performed under the contract. The fact that DM would not have attributed a strength in this regard is of no note. It was not arbitrary or capricious for DOE to have assigned a significant strength for Fluor's organizing principle under the Management Approach factor. Likewise, we cannot accept plaintiff's invitation to quibble with the SSO in deciding that this was one of the reasons to pay a premium for Fluor.

B.  Fluor's Strength for Planning

The SSO cited Fluor's strength under the Management Approach factor for "comprehensive and effective planning process for the near term and long term for the SPR" as a "further discriminator." AR 5775. The SSO explained that it "is important that the M&O contractor recognize and plan for both the

near-term and long-term for the SPR as its mission evolves, and that near-term detailed plans are integrated with longer term program consideration, as reflected in the SEB's evaluation of Fluor's proposal." *Id.* The SEB and SSO assigned a weakness, on the other hand, to DM for its "failure to recognize and address the longer term, including lack of detail in the concepts presented and lack of clarity as to what exactly the M&O Contractor will do, when and how it will be done, expected outcomes and practical issues or problems to overcome." AR 5743 n.1; *see also* AR 5775.

Plaintiff argues that such statements make clear that the SSO did not follow the stated evaluation criteria. Plaintiff states that the solicitation did not require long-term planning for the Management Approach factor and did not promise to evaluate long-term approaches. Thus, in plaintiff's view, it should not have been assigned a weakness for lack of long-term planning.[4] Without that weakness, according to plaintiff, the agency's decision to make an award based, at least in part, on this discriminator was arbitrary and capricious.

Plaintiff also points the court to several places in its proposal where it believes it proposed long-term actions as part of DM's SPR 2020 Program, which took a view out to the year 2020. *See* AR 1007, 1019, 1024, 1031-32, 1048-49 (excerpts from DM's proposal). Plaintiff argues that "specific objectives and target dates for that program . . . are set forth on a detailed timeline included in [DM's] proposal." Pl.'s Memo in Supp. 22 (citing AR 989 (timeline for SPR 2020 Program)). Thus, in plaintiff's view, DOE's award of a strength to Fluor and weakness to DM was unequal treatment and unreasonable.

Once again, we cannot substitute our judgment for that of the agency. The SEB and the SSO found a strength in Fluor's proposal as it relates to planning for the near, middle, and long-term horizons. As plaintiff admits, it cannot find fault with giving a strength to Fluor for its proposal in this respect. Although it believes it should also have been awarded a similar strength, its real qualm is with DOE's assignment of a weakness for a lack of clarity in

---

[4] At oral argument, plaintiff clarified that it was not *per se* improper for the agency to have awarded a strength to Fluor for its long-term planning because offerors are always at liberty to propose enhancements to the agency. It is, however, improper for an agency to cite a proposal as weak in an area for which the solicitation did not seek information. That is what plaintiff believes happened here.

long-term advantages offered by DM.

Plaintiff is wrong when it suggests that the solicitation was not concerned with long-term planning for the SPR. In the PWS, under Operations, the solicitation called for the contractor to "[p]erform management, planning, oversight, documentation, training, operational functions, energy management and crude oil activities associated with the operation of the SPR sites/facilities." AR 692. In fact, for maintenance, the PWS specifically asked the contractor to develop long-term plans. AR 694. The PWS next includes a list of activities that contractors were to manage and "plan." AR 692. The requirement to plan for future activities is also listed for a variety of additional contractor duties in the PWS. *See, e.g.*, AR 692 (Drawdown Readiness), 693 (Petroleum Acquisition and Transportation), 694 (Major Maintenance: "Develop long-term plans and, as assigned, perform major maintenance projects . . ."), 697 (Project Management).[5]

In the introduction to the PWS, the solicitation requires the offeror to "develop and implement innovative approaches and adopt practices that foster continuous improvement in accomplishing the mission of the SPR." AR 689. DOE further stated that the contract should reflect "application of performance-based contracting approaches and techniques which emphasize results/outcomes and minimize 'how to' performance descriptions." *Id.* From the start, offerors were on notice that the agency sought more than a recital of the PWS and how much performance would cost. DOE was seeking innovation and continuous improvement in operation of the SPR.

The SEB found that most of the improvements proposed by DM were

---

[5] Several other major items in the PWS call for the contractor to develop and manage systems and programs for the SPR: Environmental Management System, including a Site Sustainability Plan, AR 695; Security Program, AR 695-96; Quality Assurance Program, AR 696; Financial Management program, AR 967; DOE-approved procurement system, AR 698. The list goes on to include development of projects for personal property management, human resources, safety and health, and emergency management. AR 698-700. For Information Systems and Knowledge Management, the contractor was required to "orient all planning and implementation towards deploying forward-looking technologies which maximize overall operating efficiencies and best business practices from enterprise resource planning and knowledge management perspectives." AR 697.

related to information technology or extending the life of existing facilities. DOE found, however, that DM's proposal had a "lack of detail in the concepts presented." AR 5531. The SSO repeated this criticism in his decision and cited what he viewed to be the weakness of DM's SPR 2020 program. *See* AR 5775.

DOE found that Fluor's proposed activities and improvements to the SPR would mean that "near-term detailed plans are appropriately integrated with longer-term program considerations," which DOE considered to "ensure a strategic approach to planning and budget formulation." AR 5775. Plaintiff attempts to shift the focus to the long-term planning cited by the agency as a strength for Fluor and weakness for DM. It would be a mistake to view it that narrowly, however. The majority of projects proposed by both offerors deal with the 10 year contract life. Per the agency, Fluor's proposal included better detail for its proposal in the near, mid, and long-term phases, including beyond the 10 year window. Certainly DM was not taken by surprise by the agency's evaluation of longer-term planning. As it details in its briefing, DM offered a variety of activities and plans for the SPR, including goals extending past the 10 year contract window. The agency simply valued the detail included in Fluor's proposal over that in DM's proposal. That was not arbitrary or capricious.

C. Fluor's Operation and Maintenance/ Cavern Integrity

The third discriminator on which the SSO relied was Fluor's "multiple approaches to improve operations and maintenance, including geotechnical issues associated with SPR cavern integrity." AR 5744. The SSO found Fluor's proposal to establish a Subsurface Advisory Group and operator's forum to be specific additional advantages, which, in concert with Fluor's strength in planning, offered an "effective forward looking approach for cavern or geotechnical issues being faced by the [SPR]." AR 5776.

DM argues that this amounted to disparate treatment because both offerors were awarded strengths under the Management Approach factor for effective operations and maintenance aspects of their proposals. *See* AR 5527 (DM), 5533-34 (Fluor) (SEB Report). Thus, "in view of their comparably rated operations and maintenance proposals, it was arbitrary and capricious for the SSO to conclude that Fluor's operations and maintenance proposal was a discriminator." Pl.'s Memo in Supp. 22. Plaintiff goes on to argue that there is nothing in the record to support the evaluation of Fluor's proposal as superior to DM's with respect to its approach to cavern integrity. It argues that

the formation of an advisory group and operators' forum are designed to "mitigate the 'learning curve' that Fluor would experience in the event it was awarded the contract." *Id.* at 23. Plaintiff then asks the court to consider its proposal with respect to cavern integrity, including its own employment of a noted expert in the field, Mark Erskine. When compared in that light, plaintiff argues that it was arbitrary and capricious for the agency to have awarded to Fluor on the basis of a strength that, at best, was present in both proposals.

Fluor's allegations with regard to this discriminator once again represent a disagreement with the agency's judgment. The agency found very attractive Fluor's proposal to develop a Subsurface Advisory Group and a forum of salt cavern owners to trade operation and maintenance information. Although DM's proposal also contained information and plans to ensure cavern integrity and the agency credited DM's proposal with a strength for effective operations and maintenance, the agency could, within its discretion, prefer one offeror's plan in this regard over that of another.[6] It was not irrational for DOE to have pointed to this aspect of Fluor's proposal as a reason that Fluor's proposal represented the best value to the government.

D. DM's "Satisfactory" Rating for the Management Approach Factor

Plaintiff also asks the court to consider its rating of "satisfactory" for the Management Approach factor to be insufficient because the narrative rationale for the rating also was consistent with a "good" rating, which is what Fluor received for that factor. Plaintiff argues that it met each of the solicitation's three requirements for a "good" rating: that the proposal demonstrates a high probability of successful contract performance; that it demonstrates a proficient understanding of the contract requirements; and that "[s]uch a response may be evidenced by a proposal that exhibits few, if any, significant strengths; many strengths; few weaknesses; few, if any significant weaknesses; and no deficiencies." AR 958 (Source Selection Plan's definition of a "good" rating).

---

[6] Plaintiff also proposed to hire Mr. Erskine, already an employee of DM. We do not place central importance on Fluor's proposal to hire Mr. Erskine, however. The advisory group and owners' forum were not dependent upon that hire, and plaintiff proposed other individuals in the event that Mr. Erskine was unavailable. This is thus not a reason to reject the agency's preference for Fluor's proposal.

Plaintiff points out that its proposal received one significant strength, five strengths, three weaknesses, no significant weakness, and no deficiencies, *see* AR 5526-31, consistent with the third prong of the "good" definition. In addition, plaintiff points the court to the SEB Report's finding regarding DM's Management Approach rating, specifically its description of DM's significant strength under that factor: "The DM proposal demonstrates significant effectiveness, and completeness in its approach to performing the PWS work elements under the solicitation that reflects a comprehensive description and understanding of the proven systems, policies and procedures currently in use under the SPR M&O contract." AR 5526. The report goes on to list three examples that the SEB believed would "appreciably increase the probability of successful contract performance." AR 5527.

Although these facts might be consistent with a rating of "good," they do not compel it. They are also consistent with "satisfactory." The rating scheme allows for the exercise by the agency of its judgment in drawing admittedly fine distinctions. The line between "a high probability of contract performance" and "a moderate probability of successful contract performance," for example, is likely a narrow one. *See* AR 958 (comparison of the definition of "Good" and "Satisfactory"). It is not, however, one that the court may draw in the first instance. *See Sci. Applications Int'l Corp. v. United States*, 108 Fed. Cl. 235, 281 (2012) ("The Agency's discretion in these technical subjective evaluations and adjectival ratings is not like balancing weights on a scale."). Plaintiff has not presented a reason why it was irrational for it to have been rated "satisfactory" for the Management Approach factor.

Even were plaintiff to have its rating for Management Approach elevated to "good," it has not alleged a basis on which we could conclude that the agency acted arbitrarily in finding that Fluor offered the best value to the government. While plaintiff was a successful incumbent contractor with a good record of performance and the lowest priced proposal, those facts are insufficient to supplant the agency's judgment. The agency found the price difference to be small, and it found three specific aspects of Fluor's proposal to be more advantageous to the government.

II. Organizational Structure

Plaintiff attacks the rating of its proposal as "good" for the Organizational Structure as irrational because the SEB cited several items in DM's proposal as advantageous, which should have boosted it from receiving three strengths and no significant strengths to at least one significant strength.

Had DM received a significant strength under the Organizational Structure factor, it believes its adjectival rating would have been elevated to "outstanding."

Plaintiff also cites as evidence of DOE's fault in this regard the individual SEB members' ratings for this factor. Individually, four of the five SEB members initially rated DM as "outstanding" while only one SEB member evaluated DM as "good" for the Organizational Structure factor. Plaintiff argues that the record is inadequate to explain the final consensus "good" rating in the face of this "virtually unanimous" view of DM's proposal for this factor. At oral argument, plaintiff suggested that the agency may have made a clerical error in the SEB's consensus report, which may then have resulted in a faulty best value decision by the SSO.

We cannot engage in speculation as to why the SEB's consensus report resulted in only a "good" rating for DM's proposed Organizational Structure. The board members were entitled to change their minds after discussion. As we have held, the initial individual ratings of SEB members have "little bearing on [a] protest" when the SEB reaches a consensus rating. *Tech Sys., Inc. v. United States*, 98 Fed. Cl. 228, 247-48 (2011). The change from the initial individual ratings is thus not a basis, standing alone, to upset the SEB's consensus rating or the SSO's reliance on it. And it is clear from the consensus report and the SSO's decision that the change was not due to a clerical error.

DM likewise has not provided any other reason why its "good" rating for Organizational Structure was arbitrary or capricious. The fact that it received three strengths but no significant strengths fits squarely within the definition of "good." Although the agency reserved for itself discretion to aggregate strengths to find a significant strength, it did not chose to do so, and plaintiff has not provided a reason to disturb that decision.

III. Past Performance

The agency rated both offerors "good" for Past Performance. Plaintiff challenges one aspect of DOE's past performance evaluation as having unfairly prevented DM from achieving a better rating and one aspect of Fluor's evaluation as having allowed it to receive a higher rating than it should have.

A.  DM Petroleum's Grass Cutting Incident

DOE evaluated contracts previously performed by DM and two of its subcontractors, including the incumbent contract for the SPR M&O effort. DOE found elements of four prior efforts to be "highly favorable," including the incumbent M&O contract.  DOE found elements of three other contract efforts to be "favorable."   The agency also cited one aspect of DM's performance of the SPR M&O contract to be unfavorable: a fatality suffered in connection with grass cutting at one of the SPR locations. *See* AR 5620-21. OHSA conducted an investigation of the incident and "determined no violation existed and attributed the accident to the deceased's willful disobedience." AR. 5621.  The SEB noted that DM took corrective action above and beyond what the agency deemed necessary.

DM argues that this incident was unfairly attributed to it in the past performance evaluation and, had it not been, DM would likely have been rated higher.  As evidence, DM cites OHSA's findings that the incident was due to willful disobedience of an employee and DM's corrective action thereafter. It argues that it is is unreasonable in the face of those facts to find that incident to be unfavorable.  Without that single "unfavorable" rating, DM's four "highly favorable" ratings and three "favorable" ratings might have resulted in a rating of "outstanding" for Past Performance.[7]

Aside from the fact that plaintiff has not argued prejudice with regard to this factor–it argues only that it was arbitrary for DOE to have assigned an unfavorable rating for the grass cutting incident, but not also that this would have resulted in a higher overall rating for past performance–DM has not established that the agency did anything arbitrary or capricious.  The agency's consideration of this past performance incident is not controlled by OHSA's conclusions about the same event.  DOE considered OHSA's finding and DM's corrective measures but found that this incident still merited an "unfavorable" notation.   In doing so, it considered DOE's internal investigation of the incident in which it found that one of two root causes was the "failure of SPR-BM site stop work policy and its implementation in addressing less than imminent danger situations."  AR 4956.  DOE further found "less than adequate work control process" and "unavailability of the

---

[7] Plaintiff does not explicitly allege in its primary brief that the agency would have rated it higher without the unfavorable rating for the grass cutting incident.  It argues that the evaluation was arbitrary and capricious.

supervisor due to other duties" as contributing causes.  AR 4957.  In light of those findings, we cannot say that it was arbitrary or capricious for the agency to have found the grass cutting incident to contribute to "an unfavorable" rating.

B.  Fluor's Subcontractor APOM's Past Performance

Eight past contracts performed by Fluor and three subcontractors were considered by the agency under the Past Performance factor.  DOE found elements of four of them to be "highly favorable," six elements to be "favorable," and one to be "unfavorable."  The agency declined to specifically rate the past performance of one subcontractor, Arctic Slope Regional Corporation Petroleum Operations and Maintenance, LLC ("APOM"), because it was a newly formed venture.  DOE found that the two efforts proposed to be evaluated for APOM were performed by two other subsidiaries of APOM's parent corporation, Arctic Slope Petroleum Corporation ("ASRC"), and that they thus did not provide a basis for evaluating APOM.  Pursuant to the solicitation, APOM was given a "neutral" rating for Past Performance.  AR 5519 (definition of "neutral"), 5761 (SSO's statement that APOM was rated as "neutral" for past performance).

Plaintiff alleges that a fatality that occurred during performance of a DOE Construction Management Service ("CMS") contract by ASRC Gulf States Constructors, LLC ("AGSC") should have resulted in an "unfavorable" past performance rating for APOM.  Both APOM and AGSC are subsidiaries of ARSC.  Plaintiff points to parts of Fluor's proposal in which Fluor seems to attribute performance of the CMS contract to APOM.  *See, e.g.*, AR 1741 ("Fluor chose APOM as our pre-selected small business subcontractor and Mentor-Protégé based on their experience managing oil field operations, strong performance on the SPR CMS contract . . . .").  Plaintiff also makes much of the fact that neither in this protest nor before the GAO did Fluor offer evidence that APOM is distinct from AGSC or that APOM would not utilize AGSC's personnel and resources in performance of the M&O contract.

As with its argument about the grass cutting incident, plaintiff has not established, or even really argued, that an "unfavorable" rating for this particular incident for APOM would have resulted in lower past performance rating for Fluor.  APOM was given an overall "neutral" rating for past performance. Fluor had four other prior efforts found to be "highly favorable" and six found to be "favorable."  The existence of one additional "unfavorable" rating in the mix with so many positive ratings is very unlikely

to have changed Fluor's past performance rating.  DM, in fact, had one "unfavorable" rating for the same contract on which it also had a "highly favorable" rating, the incumbent SPR M&O contract. It was nevertheless rated "good" with respect to past performance.

Putting aside the inability of plaintiff to show prejudice in this regard, we find that the agency did not act irrationally in its decision not to credit the negative incidents of AGSC to APOM.   The agency considered the same information that plaintiff presents now and concluded that it was insufficient to attribute the negative incidents to APOM. *See* AR 5761 (SSO's decision). The SSO specifically concluded that the resources of AGSC would not be relied upon by APOM in contract performance and that this incident would not, in any event, affect his rating of Fluor as "good" for past performance. *Id.* In the absence of a reason to conclude to the contrary, other than mere disagreement, we cannot disturb the agency's conclusion with regard to the past performance rating of Fluor.[8]

## CONCLUSION

We have considered each of plaintiff's arguments, including the ones only briefed and not brought forward at oral argument.   Collectively they merely reflect disagreements with the agency's exercise of its reasonable judgment in rating Fluor's and DM's proposals with respect to various technical factors.[9]   The agency was well within its discretion to evaluate the proposals as it did.   Plaintiff has neither established a violation of law or

---

[8] Defendant does recognize one inadvertent mistake in the SSO's selection decision with regard to one of the negative incidents, the death of a dog belonging to a security subcontractor.  The SSO's decision states that it was premature to make a conclusion with regard to this incident because the investigation was still pending.  That was not accurate at the time of the actual contract award, September 2013.  The investigation was concluded in July 2013. *See* AR 6438-39.  Defendant points out, however, that this was not prejudicial to DM because the dog died at the hands of one of DM's subcontractors, not Fluor's.

[9] As stated at the outset, we have concentrated this opinion on the issues raised during oral argument.  We have considered all of the arguments raised by plaintiff in its brief, including any not treated specifically herein, and find that none of them merit relief.

regulation nor presented any evidence of arbitrary or capricious action on the part of the agency.   Accordingly, plaintiff's motion for judgment on the administrative record is denied.  Defendant's and intervenor's cross-motions for judgment on the administrative record are granted.  The Clerk is directed to enter judgment accordingly and dismiss the complaint.


s/Eric G. Bruggink
ERIC G. BRUGGINK
Judge